IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PETER JORDAN CHIESA,

    Petitioner,       Case No.1:07-cv-00667 ALA (HC)

    vs.

MARTIN VEAL, Warden,      **ORDER**

    Respondent.

_____/

    A Calaveras County Superior Court jury convicted Peter Jordan Chiesa ("Petitioner") of two counts of second-degree murder in violation of California Penal Code section 187. The jury also found that he committed these murders with a personal firearm in violation of Penal Code section 12022.53(d). ( Am. Appl. at 4).[1] The trial court sentenced Petitioner to two consecutive fifteen years-to-life prison terms for the murder convictions. He was also sentenced to serve consecutive twenty-five years-to-life enhancements for his personal firearm use as to each count of second-degree murder. (Resp't Answer at 3). Thus, he was sentenced to eighty years-to-life imprisonment.

    Pending before this Court is Petitioner's amended application for a writ of habeas corpus

---

[1] Am. Appl. is the abbreviation used for Petitioner's amended application for a writ of habeas corpus.

1

pursuant to 28 U.S.C. § 2254(a), filed on October 27, 2008 (Doc. 23), Respondent's Answer (Doc. 29), and Petitioner's Reply, which is styled "Traverse." (Doc. 33). For the reasons discussed below, Petitioner's application for a writ of habeas corpus is denied.

# I

The California Court of Appeal for the Third District, summarized the facts as follows[2]:

> Ronald and Annette Truman, William and Leslie Hannameyer, and defendant and his wife Donna owned parcels of land adjacent to each other off Highway 12 in Calaveras County. The Truman parcel was west of defendant's parcel, and the Hannameyer parcel was west of the Truman parcel. The Trumans and Hannameyers obtained access to their properties from Highway 12 by means of a dirt road that ran within an easement across defendant's property. The easement was 50 feet wide, and was granted for ingress and egress and for utilities.
>
> The access road was much narrower than 50 feet. The portion of the road on defendant's property was lined on one side with eucalyptus trees planted by defendant. Oak trees lined the other side.
>
> Relations between defendant and his neighbors were not good. Over the years, the Trumans and the Hannameyers had numerous confrontations with the Chiesas regarding the use of their properties. Much of the acrimony concerned the parties' use and maintenance of the access road and the easement. Defendant had accused his neighbors of stealing his gravel to widen the road, making the road too wide towards the eucalyptus trees and taking part of his land. The Trumans and Hannameyers claimed it was not defendant's land but was part of the easement, and they were entitled to use the easement's entire 50-foot width. They thought no one owned the easement. FN1.
> FN1. While under cross-examination, Ronald Truman was asked to confirm he thought the easement was owned by no one:
> "A. Well, I know it had to be owned by someone. But I-
> "Q. Who did you think-
> "A. But I just didn't know who.
> "Q. So did you think you may have owned it?
> "A. No, Sir. I know I didn't own it.
> "Q. Well, if you didn't own it, were the Chiesas the only other parties that could own it?
> "A. Yes, sir.
> "Q. So you knew, then, that Chiesas owned that property?
> "A. Yes, sir."
>
> In early 2002, defendant installed metal posts on either side of the

---

[2] The factual findings of the Court of Appeal are presumed correct as Petitioner has not raised a challenge to their accuracy. *See* 28 U.S.C. § 2254 (e)(1).

easement road that restricted entrance to a 14-foot-wide space between the posts. Johanna Smith, a friend of Annette Truman and Leslie Hannameyer, saw defendant setting the posts. She asked defendant why the parties were not communicating about the easement, and defendant said he wanted to get his property back. Smith asked him what he would do if a court ordered him to stop. Defendant replied he would do whatever it took to get his property back, and said, "They shoot people [for this] in other countries."

The Trumans and Hannameyers complained to the Chiesas about the posts, asking them to provide greater width to the access road. They also complained about a wooden fence the Chiesas had begun constructing alongside the easement road and within the easement.

The Chiesas hired attorney Stephen Zalkind to advise them of their rights. Zalkind informed them under California law, the dominant tenement owners of the easement could use only as much of the easement within the 50 feet as was reasonably required to access their properties. The servient tenement owner continued to own the property, was required to pay taxes on the property, and could use the property in a manner that did not unreasonably interfere with the dominant tenement owners' right of access. The Chiesas could plant trees in the easement as long as they did not interfere with access. Zalkind also testified the minimum required width of this type of roadway under county ordinance was 18 feet.

The attorney for the Trumans and Hannameyers, Kenneth Meleyco, took the position that his clients were entitled to use the entire 50 feet of the easement. The Trumans and Hannameyers sued the Chiesas to have the posts removed, to obtain a declaration of the parties' rights under the easement, and also to stop defendant from erecting the fence. They sought a preliminary injunction.

In response, the Chiesas filed a cross-complaint to declare they had the right to place the posts a minimum of 19 feet apart and to quiet title against the neighbors. Before the hearing on the injunction, defendant moved the posts to approximately 19 feet apart, but the plaintiffs sought greater access. Once, after the suit was filed, defendant told Ronald Truman that when neighbors start arguing, "ugly things happen, real ugly things." The trial court in that action denied the Truman and Hannameyers' motion for a preliminary injunction.

In late spring 2002, the Chiesas hired a tree service company to trim the eucalyptus and oak trees along the easement road and some trees that existed between their property and the Truman's property. The work took about two weeks to complete. The company's workers left the road relatively clear, but there were tree trimmings left on the ground, including some on the road.

The Trumans and Hannameyers decided to prune the eucalyptus trees

3

even more and clean up the trimmings along the road and under the trees. They did this in part on the advice of attorney Meleyco, who told them it would affect their rights to the easement. Before then, the only clean-up they had done was pick up branches and litter on the road. They had not cleaned under the trees before as they believed it had not been necessary. They did not notify the Chiesas of their intentions.

Annette Truman and Leslie Hannameyer began the work on the morning of June 25, 2002, aided by their sons, 11-year-old Ben Truman and 15-year-old Brian Hannameyer. They had a chainsaw and ATVs, one of which was pulling a trailer.

At 10:03 a.m., the defendant telephoned 911 and stated: "I'm going to shoot these mother fuckers down here. They're cutting my trees down." Defendant gave his name and address and said to hurry up because he was going there with a gun. When asked if he had said he would shoot them, defendant replied, "You better believe it."

At one point, Brian left the group on an ATV to tow a branch to a burn pile. Annette was working at the road's edge by the eucalyptus trees near Ben and the ATV and trailer, and Leslie was working close by. Defendant drove his truck to the workers and walked over to the ATV. He had a handgun in one hand, a rifle in the other, and an ammunition belt slung over his shoulder. Defendant asked Annette, "What the hell are you guys doing here?" Annette told defendant they had a right to be there because it was nobody's property. Annette told Ben to call the police, and he left.

As Ben ran home, he heard a shot. He looked back, and saw his mother run out of the trees holding her arm. She yelled for him to call 911. Defendant was walking out of the bushes and had his gun pointed towards the bushes. Ben heard another shot and kept running. He looked back and saw defendant in the middle of the road by the ATV.

Ben ran to Brian, who was returning from dumping the tree branch. Ben told him someone was shooting at their mothers. They both headed to Brian's house where they called 911. Ben reported his mother had been shot and five or six shots had been fired at him. Ben later told police he heard two shots, saw his mother had been shot and saw the color of Leslie's shirt near the ATV, and then he heard five or six more shots fired and bullets flying by him.

A motorist traveling on Highway 12 heard gunshots and saw a man fire a handgun more than one time. He also saw a woman bent over a small quadrunner. A neighbor across the street from defendant also saw a man fire a handgun apparently into the ground. Both witnesses thought the man was trying to shoot at snakes. The neighbor also saw Ben Truman run down the road.

Police found Leslie slumped over between the ATV and the trailer. Annette was lying on the ground about 200 feet away on the road's edge. Neither woman had a pulse. It was later determined Leslie died from a bullet wound shot at close range to the base of her skull. Annette died from a bullet wound to her upper back. She also had a bullet wound in the back of her arm.

After shooting the two women, defendant returned to his house, called 911, and said he would not be taken alive. A SWAT team surrounded his house while a sheriff's negotiator continued speaking with defendant on the phone. The recorded conversation was played to the jury.

Over the course of the three-hour call, defendant admitted shooting the women. When he heard the women cutting the trees, he "just saw red," and could not believe they had the audacity to cut his trees. He drove to them, taking guns to defend himself due to his weakened health and to protect his property. They were trespassing and were going to haul away firewood the tree cutting service had left for him to use to heat his house. He shot the women because when he encountered them, they claimed it was their easement and they were belligerent, essentially telling him to "go to hell" even though he pointed a gun at them. He shot them at "point blank," and fired a second round into one as she started to run. "I just couldn't see straight. I just could not see. All I could see is these stupid two women scowling at me. Telling me essentially ... this is our easement.... [¶] ... And I, I, I, I, the trigger just fired. You know. I mean I was just so mad."

Defendant eventually surrendered. Upon searching defendant's house, officers found laid out on defendant's bed two bandoliers with ammunition, a 30-30 Winchester brush rifle, and a loaded Ruger Blackhawk .357 revolver. There were four spent casings near the gun. It had been shot four times since the last time it had been cleaned. The rounds had been fired recently, and it was likely the .357 had been used that day to fire the four rounds. No casings or expended rounds were found near the bodies.

## II

On direct appeal, the California Court of Appeal affirmed the judgment of conviction and the trial court's sentencing decision. *People v. Chiesa*, No. C047001, 2005 WL 3113464 (Cal. App. 3d Dist. Nov. 24, 2005). The California Supreme Court denied review on January 4, 2007.

## III

Petitioner's amended application for a writ of habeas corpus challenges the legality of his sentence on two grounds. First, he contends that his "right under the Eighth Amendment, to be

5

sentenced in accordance with his individual culpability, was violated by his sentence of eighty-years to life." (Am. Appl. at 5). Second, Petitioner asserts that the imposition of consecutive sentences for each count of second-degree murder violated his Sixth and Fourteenth Amendment rights. (*Id*. at 13).

## A

Petitioner's application was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a federal court has limited power to grant habeas corpus relief under § 2254(d). AEDPA provides that

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), "[a] state-court decision is 'contrary to'... clearly established [United States Supreme Court] precedents if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant habeas relief if the state court identified the correct governing legal principle from Supreme Court precedent, but unreasonably applied that principle to the facts of the case at bar. *Williams*, 529 U.S. at 413. A petitioner bears the burden of showing that the state court applied Supreme Court precedent in an objectively unreasonable manner. *Price v. Vincent*, 538 U.S. 634, 641 (2003) (citation omitted). A federal habeas court "may not issue the writ simply because that

court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous") (internal quotation marks and citations omitted).

### B

To determine whether a state court decision is contrary to, or involved an unreasonable application of, clearly established federal law, this Court looks to the state's last reasoned decision. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Respondent has conceded that "[t]he claims in the Petition are exhausted to the extent, and solely to the extent, they renew the claims noted and rejected by the California Court of Appeal . . . in any event, each claim lacks merit." (Resp't Answer at 2).

### 1

The California Court of Appeal rejected Petitioner's Eighth Amendment claim on procedural grounds. The Court held that "[Petitioner] claims his sentence of 80 years to life violates the federal and state constitutional bans of cruel and unusual punishment because it was grossly disproportionate to his culpability. [Petitioner], however, failed to raise this argument below. He thus forfeited his right to raise it on appeal." *People v. Chiesa*, No. C047001, 2005 WL 3113464 at *8 (Cal. App. 3d Dist. Nov. 24, 2005) (citations omitted).

Under certain circumstances, procedural default is considered an adequate and independent state ground that precludes a federal court's review of a habeas application. *Chaker v. Crogan*, 428 F.3d 1215, 1220 (9th Cir. 2005). Here, however, Petitioner's Eighth Amendment claim is not barred from federal review because Respondent failed to raise procedural default as an affirmative defense in its answer to the application for federal habeas corpus relief. *See Franklin v. Johnson*, 290 F.3d 1223, 1229 (9th Cir. 2002) (quoting *Trest v. Cain*, 522 U.S. 87, 89

1  (1997) ("Procedural default is normally a defense that the state is obligated to raise and preserve
2  if it is not to lose the right to assert the defense thereafter.").
3  When a state court did not adjudicate a claim on the merits, "AEDPA's standard of
4  review does not apply." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002). Accordingly, this
5  Court will conduct a de novo review. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003)
6  (holding "that when it is clear that a state court has not reached the merits of a properly raised
7  issue, we must review it de novo.").

**2**

9  The California Court of Appeal also rejected Petitioner's argument that the trial court's
10 imposition of consecutive sentences violated *Blakely v. Washington*, 542 U.S. 296 (2004). The
11 California Court of Appeal held that "our Supreme Court has determined California's
12 consecutive sentencing scheme does not violate *Blakely* (*People v. Black* (2005) 35 Cal. 4th 1238,
13 1261-1264)." The California Court of Appeal did not provide a reasoned explanation as to why
14 *Blakely* is inapplicable to California's consecutive sentencing scheme. [3]
15 The Ninth Circuit has held that

> [a]bsent a reasoned explanation, federal courts are left simply to speculate about what 'clearly established law' the state court might have applied, as well as how it was applied. Thus, . . . in such circumstances, the state court decisions do not warrant the deference we might usually apply and that the district court properly deduced that it was left with no alternative but to review independently the claims of the petition.

20 *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (internal quotations and citations omitted).
21 Accordingly, this Court must conduct an independent review of Petitioner's Sixth Amendment
22 *Blakely* claim to determine whether the California Court of Appeal erred in its application of
23 decisions of the United States Supreme Court.

---

[3] The California Court of Appeal relied on *People v. Black,* 35 Cal. 4th 1238, 1261-64 (2005), in considering that the imposition of consecutive sentences is unaffected by *Blakely*. *Black* was later overruled by *Cunningham v. California*, 549 U.S. 270 (2007) on other grounds.

**IV**

Petitioner contends that his mandatory consecutive sentences violated his Eighth Amendment right to be free from cruel and unusual punishment because California law did not permit the trial judge to consider Petitioner's personal culpability in light of his mental impediment. (Am. Appl. at 5). At trial, Petitioner's counsel presented medical reports and testimony, which indicated that Petitioner, before the murders, had suffered damage in his prefrontal cortex, temporal lobes, and cerebellum as a result of a stroke. Petitioner's counsel argued that this damage left him unable to control his emotions, temper or impulses. Dr. Myla Young, a neuropsychologist, and Dr. George Wilkinson, a forensic psychologist, examined Petitioner and testified that he suffers from vascular dementia with delusions and personality change. They also testified that Petitioner knew what he was doing when he shot the women, but that this conduct was driven by impulse and not choice.

Dr. Bennett Blum, a forensic psychologist, testified as a witness for the prosecution. He opined that Petitioner suffered from vascular dementia, but he did not suffer from delusions. Dr. Blum also testified that Petitioner's actions on the day the crimes were committed followed a sequence, which demonstrated his ability to make choices and control his conduct.

In support of his challenge to the trial court's imposition of consecutive sentences for the second-degree murder of discrete victims, Petitioner asserts that "clearly established federal law from the United States Supreme Court recognizes that differing levels of culpability attach to those with less than fully functioning brain–those who are young and whose brains are not yet fully formed and those whose brains are malformed at birth leading to developmental disabilities." (Am. Appl. at 12). Relying on *Thompson v. Oklahoma*, 487 U.S. 815 (1988) and *Aikens v. Virginia*, 536 U.S. 304 (2002), two capital cases, Petitioner argues that

> [he] should [have been] be sentenced in accordance with a level of culpability associated with his severely impaired brain functioning due to dementia. No provision exists in California law. As such [California law] fails to comply with clearly established federal law that requires a person's individual culpability be in accord

with their sentence.

(*Id*. at 12-13).

Relying primarily on *Aikens v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002), a capital case, Petitioner argues that

> [he] should [have been] be sentenced in accordance with a level of culpability associated with his severely impaired brain functioning due to dementia. No provision exists in California law. As such [California law] fails to comply with clearly established federal law that requires a person's individual culpability be in accord with their sentence.

(*Id*. at 12-13).

In *Atkins*, the Supreme Court held that the *execution* of a mentally retarded person is "cruel and unusual, in violation of the Eighth Amendment. *Id*. at 2252. The Court reasoned that "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id*. at 2244. Even though the Court found that mental retardation diminishes personal culpability, it made clear that "their deficiencies do not warrant an exemption from criminal sanctions." *Id*. at 2250-51.

In the instant case, Petitioner murdered his two neighbors and was "charged with two counts of willful, deliberate, and premeditated murder." (Am. Appl. At 3). In his defense, Petitioner presented evidence of his vascular dementia. Before deliberations, the trial court instructed the jury that it could consider the evidence pertaining to Petitioner's dementia to determine "whether [he] actually formed the required specific intent, 'premeditated, deliberated, or harbored malice aforethought, which is an element of . . . first degree murder.'" (Am. Appl. at 9). Ultimately, "the jury acquitted Mr. Chiesa of premeditated, first degree murder, but convicted him of second degree murder." (Am. Appl. at 4). These facts appear to demonstrate that Petitioner's mental impairment was considered by the jury. Even more critical to this Court's analysis is the fact that Petitioner was not sentenced to death. Therefore, contrary to Petitioner's position, the Court's decision in *Atkins* is inapplicable to a case where the defendant

was not sentenced to death.

Petitioner's argument is analogous to the question presented to the United States Supreme Court in *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin*, the prisoner asked the United States Supreme Court to extend the so-called "individualized capital-sentencing doctrine," announced in *Sumner v. Shuman*, 483 U.S. 66, 73 (1987), to an "individualized mandatory life in prison without parole sentencing doctrine." *Harmelin*, 501 U.S. at 995. The Supreme Court rejected this contention. *Id*.

The Supreme Court examined this issue in *Harmelin* in the context of a mandatory life sentence imposed under a Michigan statute for possession of cocaine. The prisoner in *Harmelin* contended that it was cruel and unusual punishment for the trial court to impose a life sentence without the consideration of mitigating factors. *Id*. In rejecting this argument, the Court concluded that individualized sentences are only required in capital cases and refused to apply the capital punishment doctrine to a non-capital case. *Id*. The Court explained that there is a "qualitative difference between death and all other penalties." *Id*.; *See Eddings v. Oklahoma*, 455 U.S.104, 110 (1982) (finding "that the imposition of death by public authority is ... profoundly different from all other penalties, . . . [and, therefore] the sentencer must be free to give independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation....") (internal quotation marks and citation omitted); *Lockett v. Ohio*, 438 U.S. 586, 603-604 ("Although legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in noncapital cases . . . in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") (internal quotations and citations omitted). The Court in *Hamelin* also acknowledged that a sentence does not rise to the level of an Eighth Amendment violation just because it is mandatory. *See Chapman v. United States*, 500 U.S. 453, 467 (1991)

("Congress has the power to define criminal punishments without giving the courts any sentencing discretion.").

Petitioner has failed to cite a non-capital case that requires state legislators to grant judges the authority to make individual assessments that will permit a trial court to deviate from imposing a mandatory life-sentence. Petitioner's Eighth Amendment argument is bereft of precedential support. It does not warrant habeas corpus relief.

## V

Petitioner also contends that the trial court's imposition of consecutive terms violated his Sixth Amendment right to a jury trial because the trial judge made factual determinations that each of the two counts of murder in the second degree should have been reserved for the jury. (Am. Appl. at 5). He argues that in imposing consecutive sentences, the trial court erred because it relied on "a finding of fact by the trial court not proven beyond a reasonable doubt, but it also distorted the sentencing process by relying on the mitigating factor of Mr. Chiesa's brain damage to punish him further for the actions he could not control." (Am. Appl. at 13). Petitioner asserts that this alleged error contravened the rules announced in *Blakely v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007). (*Id*. at 3, 13). Petitioner's contention is contrary to the Supreme Court's decision in *Oregon v. Ice*, ___ U.S. ___, 2009 WL 77896 (January 14, 2009).

In *Ice*, the Supreme Court addressed this question: "When a defendant has been tried and convicted of multiple offenses, each involving discrete sentencing prescriptions, does the Sixth Amendment mandate jury determination of any fact declared necessary to the imposition of consecutive, in lieu of concurrent, sentences?" *Id*. at *3. The Court held in *Ice* that a state's legislative decision to grant judges the authority to make factual findings in determining whether sentences should run consecutively does not come within the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Id*. In *Apprendi*, the Court held that it is within the province of the jury to determine any fact that increases the maximum punishment prescribed for a particular

offense. *Id*. at 490. The Court explained in *Ice* that *Apprendi*, and its progeny, sought to safeguard "the historic jury function-determining whether the prosecution has proved each element of an offense beyond a reasonable doubt." *Id*.

In rejecting Ice's reliance on the *Apprendi* line of cases, the Court reasoned as follows.

> The historical record demonstrates that the jury played no role in the decision to impose sentences consecutively or concurrently. Rather, the choice rested exclusively with the judge . . .   In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*. There is no encroachment here by the judge upon facts historically found by the jury, nor any threat to the jury's domain as a bulwark at trial between the State and the accused. Instead, the defendant-who historically may have faced consecutive sentences by default-has been granted by some modern legislatures statutory protections meant to temper the harshness of the historical practice.

*Id*. at *6.

The Court ultimately held that "in light of historical practice and the authority of States over administration of their criminal justice systems, that the Sixth Amendment does not exclude Oregon's choice." *Id*. at *3.

The California legislature has granted trial courts the discretion to decide whether multiple sentences should run concurrently or consecutively. Cal. Penal Code § 669.[4]   When a

---

[4]Section 669 provides as follows in pertinent part:

When any person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction. Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that

13

trial court fails to exercise that discretion, multiple sentences will run concurrently by default. *Id*. Pursuant to Rule 4.425(a) of the California Rules of Court, a trial court, in deciding whether to impose consecutive terms, may consider aggravating and mitigating factors.[5] "In deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors, but there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists." *People v. Black*, 41 Cal. 4th 799, 822 (Cal. 2007). If the trial court does find circumstances in aggravation, as the trial court did here, it must set forth on the record the "facts and reason" for its conclusion. *Id*. (citing Cal. R Ct. 4.420(e)). Ultimately, California law merely requires that the trial court cite its reasons for

---

establishes a minimum period of confinement under the life sentence before eligibility for parole.

[5]Rule 4.425(a) provides as follows:

Criteria affecting the decision to impose consecutive rather than concurrent sentences include:

 **(a) Criteria relating to crimes** Facts relating to the crimes, including whether or not:

   **(1)** The crimes and their objectives were predominantly independent of each other;

   **(2)** The crimes involved separate acts of violence or threats of violence; or

   **(3)** The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior.

(Subbed (a) amended effective January 1, 2007; previously amended effective January 1, 1991.)

 **(b) Other criteria and limitations** Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except:

   **(1)** A fact used to impose the upper term;

   **(2)** A fact used to otherwise enhance the defendant's prison sentence; and

   **(3)** A fact that is an element of the crime may not be used to impose consecutive sentences.

(Subd (b) amended effective January 1, 2007; previously amended effective January 1, 1991.)

1 imposing a consecutive sentence. *Id*.

2     The record demonstrates that the trial court faithfully applied California law. Accordingly, pursuant to the Supreme Court's instruction in *Ice*, this Court must reject petitioner's contention that a state trial court cannot impose a consecutive sentence unless the jury has found the aggravating factor to be true. Furthermore, the trial court did not abuse its discretion in concluding that Petitioner's impaired mental condition posed a serious danger to the community if he were to be released from prison in less than eighty years.

    For the above reasons, IT IS HEREBY ORDERED that:

    1. Petitioner's application for a writ of habeas corpus is DENIED; and

    2. The Clerk of Court enter judgment and close the case.

DATED: January 20, 2009

                                        /s/ Arthur L. Alarcón
                                        UNITED STATES CIRCUIT JUDGE
                                        Sitting by Designation